THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PHILLIP HELTON, Defendant-Appellant.

Fourth District   No. 4—86—0497

Opinion filed March 16, 1987.

Presney, Kelly & Appleton, of Springfield, for appellant.

Greg Roosevelt, Acting State's Attorney, of Lincoln (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE SPITZ delivered the opinion of the court:
Convicted following a jury trial of aggravated criminal sexual assault (Ill. Rev. Stat., 1984 Supp., ch. 38, pars. 12—14(a)(1), (2)), defendant raises five points of alleged error on appeal: (1) that he was deprived of his right to a speedy trial; (2) his motion to suppress identification testimony based upon unduly suggestive procedures was improperly denied; (3) the trial court erroneously limited cross-examination of the alleged victim's mental health history for purposes of impeachment; (4) his guilt was not proved beyond a reasonable doubt; and (5) the 25-year sentence imposed was excessive.

For the reasons to follow, however, we find none of the defendant's contentions persuasive, and we affirm.

To resolve this matter in full, we shall undertake an examination of the substantive issues raised in the order presented to us, providing relevant facts where necessary.

Defendant first maintains that, for purposes of the speedy-trial provision contained in section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 103—5), he was not brought to trial within 120 days of incarceration. He therefore contends that his motion to dismiss based upon a purported violation of his right to a speedy trial should have been granted.

The so-called speedy-trial statute provides that every person in custody for an alleged offense shall be tried within 120 days from the date he was taken into custody, unless a delay is caused by that person. (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(a).) Any such delay occasioned by a defendant will temporarily toll the running of the 120-day period within which defendant must be tried. (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(f); People v. Davis (1983), 114 Ill. App. 3d 537, 449 N.E.2d 237.) The appropriate test to determine whether a delay is chargeable to a defendant under this statute is whether an act of the defendant in fact caused or contributed to the delay. People v. Shields (1974), 58 Ill. 2d 202, 317 N.E.2d 529.

A review of the record reveals that defendant was returned to Il-

linois to face charges on July 27, 1985. The cause was originally set for trial on December 9, 1985, or 135 days later. Defendant concedes, correctly so, that the delays between December 9, 1985, and the actual trial date of May 12, 1986, were directly attributable to him. We therefore need only consider the time frame between July 27 and December 9, 1985.

Defendant engages in some curious calculation to conclude that the total delay between July 27 and December 9, notwithstanding delays directly attributable to him, was 122 days. For example, defendant filed his initial motion for substitution of judges on September 3, 1985. While an order for substitution was entered on September 6, 1985, referring the matter back to the chief judge for assignment, the cause was not actually reassigned until September 12. Defendant maintains that only the time period between the September 3 motion and the September 6 order is attributable to him. He stresses the six-day period between the September 6 order allowing the motion for substitution of judges and the actual order on September 12 reassigning the matter to a new judge represents mere bureaucratic delay which should not be counted against him.

■ We do not agree. A delay chargeable to a defendant encompasses not only the time period required to hear a motion, but also the additional time necessary to implement the relief requested. (*People v. Ortiz* (1979), 70 Ill. App. 3d 684, 388 N.E.2d 891.) Common sense dictates that the entire length of the delay occasioned by the defendant's own conduct must run from his motion for substitution until the actual reassignment nine days later. Nothing could be done on the case until another judge could be appointed to hear it. Likewise, defendant's second motion for substitution of judges, filed September 17, 1985, tolled the running of the 120-day period until the September 24, 1985, order assigning the case to Judge William Roberts.

■ Defendant also suggests that the time frame surrounding this second reassignment should not be held against him. Defendant postulates that, given his prior history of delinquency and criminality as disclosed by a presentence report, his first motion for reassignment based upon alleged prejudice should somehow have been construed to apply to all Logan County judges. Defendant presupposes that his "familiarity" with the Logan County judicial system automatically entitled him, upon one motion, to have all judges in the county excluded from presiding over his case. We cannot, however, indulge the defendant in this regard. His September 3 motion expressly raises general prejudice on the part of one particular judge. Nowhere in the motion

is prejudice alleged as to all Logan County judges; nor can such an allegation be inferred. The delay occasioned by both motions is in fact attributable to defendant.

In any event, defendant caused several other delays in this matter prior to December 9, 1985. On September 6, 1985, defendant filed a motion to suppress evidence taken from him pursuant to a court order. The hearing on that motion was continued upon defendant's own motion filed October 17, 1985. Thereafter, on November 12, 1985, the suppression motion was heard and denied. Delays occasioned by a defendant's own motions, including those caused by a motion to suppress evidence, have been held to be delays attributable to the defendant. (*People v. Jones* (1984), 104 Ill. 2d 268, 472 N.E.2d 455; *People v. Donalson* (1976), 64 Ill. 2d 536, 356 N.E.2d 776.) In addition, defendant filed a motion for a continuance on December 6, 1985, which may also be considered a delay attributable to him. (*People v. Brown* (1982), 110 Ill. App. 3d 443, 442 N.E.2d 534.) Also, on December 3, 1985, defendant filed a motion challenging the constitutionality of the statute under which he was charged.

It is the duty of the State to bring defendants to trial within the statutory time period. It is then incumbent upon a defendant in his motion for discharge to affirmatively establish a violation of his right to a speedy trial. (*People v. Reimolds* (1982), 92 Ill. 2d 101, 106, 440 N.E.2d 872, 875.) In making his proof, a defendant must establish that the delay was not attributable to his conduct. (*People v. Jones* (1965), 33 Ill. 2d 357, 361, 211 N.E.2d 261, 263, *cert. denied* (1966), 385 U.S. 854, 17 L. Ed. 2d 81, 87 S. Ct. 99.) We conclude from the foregoing that defendant clearly has not met this burden.

Defendant's next contention concerns the out-of-court identification of him by the victim, which he argues was based upon unduly suggestive procedures. Specifically, defendant finds fault with the fact that a police officer, in responding to the victim's descriptions of her assailant while she was in a hysterical state immediately after the attack, supplied the name of the defendant. He asserts that his motion to suppress this identification should have been granted.

Testimony at trial revealed that, on the night of May 18, 1985, the victim was seen by neighbors running naked through the streets of Lincoln screaming for help. Police arriving at the scene testified that she was highly emotional and upset, claiming she had been raped. Officer John Bunner of the Lincoln police department, one of the first to interview her, asked the victim if she knew who had raped her. The victim answered that although she could not recall her assailant's name, she did know he had recently been released from prison, and

that he had a brother named Loren. Based upon his personal knowledge that the defendant does have a brother named Loren, and that defendant had recently been released from prison, Officer Bunner asked if "she could possibly be referring to [the defendant]." According to Officer Bunner, the victim responded, "yes, that's him," became hysterical again, and fainted.

■■ ■ It is well settled that where a defendant moves to suppress identification testimony, he has the burden of establishing the pretrial identification procedure was unnecessarily suggestive. (*People v. Morissette* (1986), 150 Ill. App. 3d 431, 436-37, 501 N.E.2d 781, 785.) In assessing the reliability of an out-of-court identification, the "totality of the circumstances" surrounding the identification must be taken into account. (*Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382.) Once a defendant has met his burden, the evidence will be suppressed unless the State is able to show, by clear and convincing evidence, an independent basis of reliability. *People v. McTush* (1980), 81 Ill. 2d 513, 520, 410 N.E.2d 861, 865.

■■ Clearly, reliability is the "linchpin in determining the admissibility of identification testimony." (*Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253.) In evaluating the likelihood of misidentification, courts should consider: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the time of the confrontation; (5) the length of time between the crime and the confrontation; and (6) any acquaintance with the criminal prior to the crime. (*Neil v. Biggers* (1972), 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382; *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313, 1317.) Further, each case must be evaluated on its own facts. *People v. Son* (1982), 111 Ill. App. 3d 273, 443 N.E.2d 1115.

■■ Considering these factors, we do not believe the pretrial identification procedure was so impermissibly suggestive or coercive to suggest mistaken identification. Found running through town after her ordeal, the victim identified her assailant based upon the only features she could initially recall. It is undisputed she was hysterical and upset when police first spoke with her after the attack. The witness testified she had just met the defendant that afternoon, but was familiar with his brother Loren. The mere fact that a police officer supplied a name for the offender based both upon the victim's initial statement and the officer's own personal knowledge is not necessarily suggestive. This would go more to the weight the trier of fact would

afford such identification testimony, not necessarily its admissibility. Her reaction to the name further bolsters the inference that this was not a misidentification based upon improper suggestiveness.

■■■ Even were we to consider this procedure unduly suggestive, we nonetheless believe the State sufficiently supplied an independent basis for reliability. The record indicates a photographic lineup was held at the hospital in the early morning hours after the attack. The victim was shown six photographs of bearded men, and immediately picked out a picture of the defendant, stating this was the man who raped her. The defendant's name was never mentioned in connection with the photos, and there is nothing in the record or testimony to indicate the identification was not reliable.

Further, the victim had ample opportunity to view defendant during the crime, and could thus make her identification in the photographic lineup based upon her observations at the time of the offense. Certainly the victim viewed the defendant's face with a heightened degree of attention; as a rape victim she "was no casual observer, but rather the victim of one of the most personally humiliating of all crimes." (*Neil v. Biggers* (1972), 409 U.S. 188, 200, 34 L. Ed. 2d 401, 412, 93 S. Ct. 375, 382-83.) We therefore hold that the motion to suppress was properly denied.

■■■ Turning to the defendant's next argument, we consider whether the trial court unduly limited impeachment of the victim. Defendant maintains he should have been allowed to elicit during cross-examination that the victim was under a prescription for medication which she was not currently taking, and that she had been hospitalized on five prior occasions for an unspecified mental condition.

It is well settled that the mental health history of a witness is relevant as it relates to his or her credibility, and is thus a permissible area of impeachment. (*People v. Lindsey* (1979), 73 Ill. App. 3d 436, 392 N.E.2d 278.) Such evidence may be introduced for the purpose of attacking the perception and memory of a witness as to events about which he or she testified. (*People v. Di Maso* (1981), 100 Ill. App. 3d 338, 426 N.E.2d 972.) Before such evidence may be introduced, however, its relevance to the witness' credibility must be established. (*People v. Walton* (1982), 107 Ill. App. 3d 698, 437 N.E.2d 1273.) The onus is on the party seeking to introduce this line of questioning on cross-examination—the defendant in this case—to establish relevancy.

■■■ We are of the opinion the defendant did not meet his burden of showing relevancy, and thus the trial court did not err in limiting cross-examination in this regard. Defendant's offer of proof indicated the victim had been hospitalized on five different occasions either

prior to or during 1983 for severe depression. She had also received a prescription for Lithium in 1983, but indicated she was not taking it at the time of the offense. From these facts alone, we fail to see how her perception and memory of events occurring in May of 1985 were adversely affected. Defendant presented no evidence that the victim was still required to take Lithium at the time of the offense. Defendant also failed to show if such a drug would alter memory. We also fail to perceive how the mere fact of the victim's hospitalization for severe depression in 1983 would impeach her credibility or affect her ability to communicate her observations of the 1985 attack accurately and truthfully. We therefore find the trial court properly excluded this evidence.

Next, defendant maintains from the totality of the evidence that he was not proved guilty beyond a reasonable doubt of aggravated criminal sexual assault.

A reviewing court will not reverse a jury's verdict unless the evidence presented is so unsatisfactory or improbable as to raise a reasonable doubt of guilt. (*People v. Yates* (1983), 98 Ill. 2d 502, 456 N.E.2d 1369, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) A conflict of testimony or an inconsistency in the evidence does not in itself establish reasonable doubt. Indeed, resolution of all factual disputes as well as the assessment of the credibility of the witnesses is the function of the jury in its role as trier of fact. This is no less true in sex offense cases where the reviewing court is under a special duty to closely scrutinize the evidence. *People v. Devine* (1981), 101 Ill. App. 3d 158, 163, 427 N.E.2d 1277, 1281.

In assessing the sufficiency of the evidence here, we must of necessity present a compilation of the relevant testimony adduced at trial. Again, the victim was seen running unclothed down a street in Lincoln yelling for help at about 9 p.m. Neighbors recalled that she was screaming, "help, rape," or "help me, help me, he's going to rape me, he's going to kill me." Police investigating the scene recalled she was extremely frightened and upset. The victim told them she had been raped. When the officers asked if she knew who did it, she identified her attacker as someone who had recently been in prison and who she knew had a brother named Loren. The officers asked if this might be Phillip Helton, the defendant, and she responded that it was. The victim was then taken to the hospital, and her apartment was searched for evidence.

Early the next morning, while still at the hospital, the victim participated in a photographic lineup. She was shown six photos of

bearded men, and immediately singled out a picture of the defendant as her assailant. The officers testified they did not suggest anything to her at the photographic lineup, and they did not mention the defendant by name.

The victim testified that, on the afternoon of May 18, 1985, she was at the Helton residence with Loren and his mother. The defendant and his girlfriend arrived there later; the victim did not know them previously, but was introduced to them. Loren Helton had been drinking, and the victim offered to give him a ride home. The defendant drove to Loren's apartment separately and they both put Loren to bed. The victim testified defendant then suggested they "spend some time together," but she was "not too keen on the idea."

The next thing the victim could recall was being in her bedroom and realizing that her bed was beginning to smolder. She could not remember anything concerning her arrival at her apartment or even how she got there. She stated the defendant was putting a cigarette to the mattress so it would catch fire, and he was laughing. Upon further questioning, she recalled that defendant had forced her to engage in sexual intercourse, anal intercourse and fellatio. She also remembered being physically dragged into the bathroom, where defendant again made her perform oral sex and urinated on her back. She further testified defendant forcibly placed a beer bottle both in her vagina and rectum. Defendant had a hold of her hair, and would hit her head against the bathtub if she refused to do what he wanted.

At one point, she testified the defendant turned the water on in the bathtub and said he was going to drown her. She then was able to flee from the bathroom, get out of the apartment, and run into the street screaming for help.

Ray Vonderahe, employed in the criminal investigation division of the Lincoln police department, testified as to a conversation with the victim occurring at the hospital the night of the incident. He testified that the victim stated her assailant forced her to have oral sex three consecutive times in the bedroom, and that the assailant had ejaculated each time in her mouth. She was forced to swallow some of the sperm, but also spit some of it out onto the bed. The victim also related to Vonderahe how the defendant had intercourse with her, pushed a beer bottle into her vagina and forced her to sit on the bottle, and also placed the bottle in her rectum.

Dr. William Burkey, a staff physician at Abraham Lincoln Memorial Hospital, recalled that upon his examination of her at the hospital that evening, the victim exhibited bruising, abrasions and scratch marks. Dr. Burkey also noted the presence of blood in the rectal

vault.

According to a crime scene technician, the bathtub in the victim's apartment was filled with approximately 6 inches of water when investigators arrived there. A watch belonging to the defendant was found in the victim's bedroom. Further testimony revealed that a beer bottle in the bedroom contained a latent fingerprint identified as that of the defendant.

Kenneth C. Knight, a forensic scientist, testified as to his examination and comparison of hair samples. He concluded that a pubic hair found in the victim's bedroom was consistent with the pubic hair standard taken from the defendant, as both exhibited 20 similar characteristics.

Andrew Wist, employed in the serology section of the State crime lab, also testified. He stated he analyzed body fluids such as blood, semen and saliva for genetic characteristics. He further stated that a rape kit taken from the victim contained vaginal, oral and rectal swabs as well as blood and saliva samples from her. He also had a blood and saliva sample from the defendant. Wist testified that seminal material was found present in the vaginal swab only, but he was unable to determine any genetic information from it; in other words, the sample could have come from any male donor.

Wist further testified that seminal material was found on the sheet of the victim's bed. He concluded that the seminal material on the sheet could not have come from the defendant.

Nancy Louise Anderson, the defendant's girlfriend, also testified. She stated she was with the defendant the entire evening of May 18, 1985. She recalled that Loren Helton had been drinking that day, and she, defendant and the victim had gone to Loren's apartment to put him to bed. The three of them then drove to the victim's apartment, where they continued drinking beer. Anderson stated she and the defendant left the victim's apartment about 8:30 to leave for Oklahoma City on a preplanned trip to visit her son.

The State then presented the rebuttal testimony of Cheryl Holmes, a police officer in Portland, Maine. Holmes stated she had taken a statement from Nancy Anderson on July 13, 1985, in Maine. According to that statement, Anderson indicated she and the defendant had gotten into a fight earlier in the afternoon of May 18 because she wanted to date someone else. The defendant then got drunk and left on his motorcycle around 4 p.m. Anderson also stated in the interview the defendant came back to her home at about 8:30 or 8:45 p.m. When he arrived he was in a big hurry, as his motorcycle screeched to a halt when he got there. Anderson related to Holmes

that defendant told her she had five minutes to pack because they were going to visit her son in Oklahoma. The interview did not mention that Anderson had been at the victim's apartment at any time that evening.

Defendant places substantial reliance on the unexplained gap in memory of the victim. He questions her inability to recall anything from the time she left Loren's apartment until she suddenly realized she was on the bed with her assailant and the bed was smoldering. Defendant stresses the victim could not recall how she got there, when she disrobed, any previous threats of physical violence, or anything else concerning the nature of her ordeal up to that point.

Defendant similarly attached great significance to some of the physical evidence presented. Specifically, defendant stresses it was determined that seminal material found on the bed could not have come from him, which is inconsistent with the victim's statement to Detective Vonderahe. While a pubic hair found in the bedroom was deemed consistent with a sample from him, he notes it still could not be conclusively shown that the hair could only have come from him. Further, defendant believes it noteworthy, considering the victim's testimony, that the rectal and oral swabs taken from the victim indicated a total absence of seminal material. Finally, defendant avers that finding his watch and a fingerprint belonging to him on a beer bottle in the victim's apartment is explained by Louise Anderson's testimony that all three were in the apartment drinking beer earlier in the day.

Contrary to defendant's assertions however, we hold the totality of evidence was sufficient to allow a jury to conclude that the victim had suffered a sexual assault, and that the defendant was her assailant. Although there are some inconsistencies in the evidence and testimony, the jury is charged with the responsibility of determining controverted facts. It is the function of the jury as trier of fact to consider the relative weight of disputed evidence. The jury can also gauge the credibility of witnesses after hearing the evidence presented, particularly in light of its opportunity to observe the demeanor of those witnesses. A reviewing court cannot substitute its judgment as to the weight of disputed evidence or credibility of witnesses for that of the jury.

The jury did not have to reject the victim's testimony based upon her inability to remember all that occurred on May 18, 1985. On the other hand, she was able to immediately identify the defendant, whom she had just met earlier that day, as her assailant. The physical evidence, while an aid in helping resolve a factual controversy, is not absolutely determinative. Further, the jury was not required to accord

greater weight to the testimony of Nancy Anderson. While Anderson stated she was with the defendant the evening of May 18, Anderson also admitted she was dating the defendant at the time, that she still visited him, and she continued to care for him. Moreover, her testimony was in direct contradiction to a statement made to a Portland, Maine, police officer.

■ We are further cognizant that where the identification of the accused is an issue, the testimony of one witness is sufficient to convict if it is positive and credible. This is true even where such testimony is contradicted by the accused, provided that the witness viewed the accused under circumstances as would permit a positive identification. *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858; *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.

■ In sum, then, we conclude that based on the victim's testimony, the evidence of her flight, her prompt complaint and identification of the defendant, and her physical condition as well as the condition of her apartment, the jury could properly find beyond a reasonable doubt that the defendant was guilty of a sexual assault. We shall not overturn their verdict here.

■ Finally, defendant asserts that the 25-year sentence imposed, with credit given for 370 days previously served, was unduly excessive. Noting the potential sentence for this offense is a period of incarceration between 6 and 30 years, and that defendant only had one previous felony conviction, defendant argues on appeal that the trial court failed to take his prior record into account. Defendant also believes the court below focused solely on the seriousness of the offense rather than on his character.

Our review of the record causes us to conclude otherwise. The imposition of a sentence is clearly a matter of judicial discretion; absent an abuse of that discretion, a sentence imposed by a trial court will not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884.) The trial judge clearly stated he had considered the relevant statutory factors in aggravation and mitigation as well as the presentence report, and imposed his sentence accordingly. A trial judge is normally in a better position to determine the punishment to be imposed than courts of review, and a reasoned judgment as to a proper sentence based upon the particular circumstances of each individual case is entitled to great deference and weight. Given the serious and demeaning nature of the offense, the defendant's extensive criminal history, and the court's related conclusion that defendant was an unlikely candidate for rehabilitation, we

find no abuse of discretion in the sentencing order.

Accordingly, for the foregoing reasons, the judgment of the circuit court of Logan County is affirmed.

Affirmed.

GREEN and KNECHT, JJ., concur.