THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LARRY DEAN MAYS, Defendant-Appellant.

Fifth District   No. 5—87—0768

Opinion filed September 28, 1989.

HOWERTON, J., specially concurring.

Daniel M. Kirwan and Janet L. Gandy, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Kathleen Alling, State's Attorney, of Mt. Vernon (Kenneth R. Boyle, Stephen E. Norris, and Ellen Eder Irish, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial, defendant, Larry Dean Mays, was found guilty of unlawful delivery of a controlled substance (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(c)) in Jefferson County and was sentenced to 12 years' imprisonment. Defendant appeals his conviction. In this cause, defendant raises the following issues: (1) whether the trial court erred in allowing into evidence the tapes of the alleged drug transaction between defendant and Larry Wade, (2) whether the trial court erred by refusing to allow defendant to present witnesses who would testify to Wade's mental health and by not requiring witness Wade to reveal his street address, (3) whether the trial judge's conduct during

the trial indicated hostility toward defendant's case to so prejudice defendant as to require defendant's conviction be reversed and remanded for a new trial, and (4) whether the trial court abused its discretion in sentencing defendant to an extended-term sentence of 12 years. We affirm in part, reverse in part, and remand for a new trial.

During the late afternoon of October 21, 1986, an eavesdrop was conducted of an alleged drug transaction in Mt. Vernon. Agents with the Illinois Department of Criminal Investigation (DCI) and an agent from the Federal Drug Enforcement Administration (DEA) met with Larry Wade, an informant for both agencies, to prepare Wade for a prearranged purchase of cocaine from defendant. Prior to the drug purchase, Wade was strip-searched by agents who recovered a $50 bill and 13 cents in change. Wade was then fitted with a recording device and given $350 to make the purchase. Wade and four agents went in a van to an area near defendant's mother's house where the transaction was to take place. Wade was dropped off a few blocks from the residence and walked the rest of the way to the house. He proceeded to the residence and returned to the agents with a clear plastic bag containing 3.58 grams of a white powdery substance later determined to be cocaine. The transaction was recorded on audio tape.

Grand jury proceedings concerning this drug transaction were conducted on May 20, 1987. DCI Agent Bill Stanhouse testified before the grand jury that Wade had informed him he had arranged for the purchase of cocaine from defendant. Agent Stanhouse testified that he then informed DEA about the purchase, as DEA was simultaneously conducting an investigation of the sale of "black tar" heroin in the Mt. Vernon area. Defendant was indicted by the grand jury on June 11, 1987, for unlawful delivery of a controlled substance. He filed a motion to suppress the recording of the drug transaction.

At the hearing on this motion, DEA Agent Herman Hogue testified that there had been an ongoing Federal investigation into the sale of "black tar" heroin in Mt. Vernon. Larry Wade had mentioned to Agent Hogue that defendant was an associate of John "Corky" Moore, who was the target of a Federal investigation. Based on this information and verbal consent by Wade, Agent Hogue obtained Federal authorization to eavesdrop on defendant during the cocaine transaction. The motion to suppress was denied.

At trial, Special Agent Stanhouse testified that he had used Larry Wade as a confidential informant from September 2, 1986,

through March 1987. DCI had paid Wade $1,075 for the information Wade supplied to the Department. Wade was paid $60 for the information obtained on defendant. Wade had called Stanhouse and told him that he had set up a one-eighth ounce of cocaine buy in the Mt. Vernon area. At 3:15 p.m. on October 21, 1986, defendant met with Agents Stanhouse, Spain, Parker, and Sergeant Townsend of DCI, along with Agent Hogue, in an area outside Mt. Vernon. Sergeant Townsend did the actual hookup of Wade to the recording device. Agent Stanhouse drove the van. Special Agent Spain rode in back with Larry Wade, and Sergeant Townsend rode in front. Hogue and Parker traveled singularly in their respective vehicles. The van stopped at 17th and Perkins at approximately 3:45 p.m., and Wade then started walking toward defendant's residence. Wade arrived at defendant's home at 3:53 p.m. Agents were monitoring Wade on the equipment in the van. Wade left defendant's home at approximately 3:57 p.m. Stanhouse observed him walking at 3:58 p.m. At approximately 4 p.m., the agents met with defendant back at 17th Street and Perkins. Wade entered the back of the van and gave Agent Spain a clear plastic bag with a white powdery substance inside. Spain then gave the plastic bag to Stanhouse. Other agents related basically the same facts.

Larry Wade testified about the alleged drug buy. He also stated that he had been convicted of shoplifting, a Federal weapons offense that had resulted in an 18-month penitentiary sentence, and theft. Wade admitted that he had used drugs, but denied that he was an addict. He further testified that on April 18, 1986, he had checked himself into a detoxification center. On cross-examination, defendant asked, "Where are you living now, Mr. Wade?" The prosecution's objection was sustained on grounds of relevancy. Wade was also asked by defense attorney if he had attempted suicide while in the Jefferson County jail in May 1986. Wade explained that he did hang himself by the neck with a towel tied around the bars, but that his cellmate, Leroy Hooker, had been standing there holding his feet. Wade explained that he had "faked" this suicide attempt in order to get to see a judge. He also explained that Leroy Hooker had been enlisted by Wade to help him stage this attempt.

Defendant called as his first witness Leroy Hooker, Jr. Before Hooker began his testimony, and before any objection by the State, the trial judge stopped the trial, summoned counsel into chambers and asked defense attorney why Hooker had been called to testify. Defense counsel explained that Hooker would testify that Wade's suicide attempt was in fact real, which would be used to impeach Larry

Wade on the issue of credibility and which would go to Wade's mental capacity. Defense counsel was allowed to begin questioning Hooker. The prosecution objected and the jury was then recessed.

The State argued that questioning Hooker about the suicide attempt was impermissible impeachment on a collateral issue. The State further argued that no single act was admissible to prove Wade was incompetent because of a mental defect. The trial judge agreed that the suicide attempt was a collateral issue. While Hooker could testify as to Wade's mental condition, Hooker's opinion could not be based on one act.

Defense counsel was allowed to make an offer of proof on the suicide attempt. Hooker testified that on May 9, 1986, he found Larry Wade hanging from the cell bars with his neck tied in a towel or sheet. Wade's feet were not touching the ground. Hooker then lifted Wade to take the weight off Wade's neck, lowered Wade to the ground, and performed mouth-to-mouth resuscitation. He also noted that Wade was "foaming at the mouth" when he found him. Hooker denied helping Wade "stage" the suicide attempt. On cross-examination, Hooker noted that he had known Wade since 1984 and he had always known Wade "wasn't wrapped tight, that he had some problems." During the five days he spent with Wade in jail in May 1986, he found Wade to be "in a state of depression, paranoia, fearful."

The stipulated testimony of the jailer, George Buretz, was short and to the effect that Wade's suicide attempt was genuine. This testimony was also excluded on the basis that the suicide attempt was a collateral issue, and while it could be used to prove mental defect, the suicide attempt alone was not enough to do so.

During closing arguments, defense counsel was explaining why he was angry during cross-examination of Larry Wade. In so explaining, he stated, "I believe that—." The prosecution objected as to what counsel believed, and the objection was sustained.

The jury found defendant guilty of unlawful delivery of a controlled substance. Defendant filed a post-trial motion on October 1, 1987. On November 6, 1987, a hearing was held on defendant's post-trial motion. At the hearing, defense counsel testified that the trial judge threw down his pencil, made facial gestures, and heaved a sigh in response to a question posed by defense counsel to Larry Wade during cross-examination. Defense counsel stated that he observed at least six jurors make an obvious response to what the judge did. He stated that he did not object at the time for fear of aggravating the situation. He could not remember the specific question which elicited such a response by the trial judge. The prosecutor testified that dur-

ing cross-examination of Larry Wade, his attention was focused on Mr. Wade. He testified that he could not say for sure that the court did or did not do the things that the defense attorney alleged. He heard nothing and saw no reaction among the jurors. Judge Krause did not remember making the gestures described by defense attorney. He stated that he would rule on the motion at the sentencing hearing.

At the sentencing hearing on November 9, 1987, the court reporter at trial was called as a witness to supplement defendant's post-trial motion. She testified that during cross-examination of Larry Wade, after defense attorney had asked a question, Judge Krause slammed down a pencil or pen on the bench. She remembered being startled because she was concentrating on taking down the "intense cross-examination" that was underway. She could not tell if the jury reacted to this incident because her back was to the jury. Judge Krause denied defendant's post-trial motion and sentenced defendant to an extended term of 12 years.

Defendant's first issue on appeal is whether the trial court erred in refusing to suppress the tapes of the alleged drug transaction between defendant and Larry Wade. Defendant argues that the tapes should have been suppressed because State and Federal law enforcement officials acted to circumvent the Illinois eavesdropping statute (Ill. Rev. Stat. 1987, ch. 38, par. 14—1 *et seq.*), which is more stringent than the Federal eavesdropping statute (18 U.S.C. §2511(2)(c) (1982)). Defendant maintains that even though DCI and DEA carried out the taping in concert, their cooperation amounted to collusion, thereby making the tape inadmissible. We disagree.

■ The Illinois eavesdropping statute prohibits the use of an eavesdropping device to record all or part of any conversation unless all parties to the conversation consent or unless one party consents and prior judicial authorization is obtained in accordance with statutory directives. (Ill. Rev. Stat. 1987, ch. 38, par. 14—2.) The Federal eavesdropping statute is less stringent. An eavesdrop may be obtained by a person acting under color of law where that person is a party to the communication, or if one party has given prior consent to the eavesdrop. (18 U.S.C. §2511(2)(c) (1982).) Where evidence is obtained by Federal law enforcement officials under authority of a Federal search warrant obtained as the result of electronic eavesdropping which conforms to Federal constitutional and statutory requirements, the evidence is admissible, notwithstanding the failure to comply with the Illinois eavesdropping statute. (*People v. Fidler* (1979), 72 Ill. App. 3d 924, 391 N.E.2d 210.) Even when Federal and

State agents are engaged in a joint investigatory enterprise, noncompliance with the Illinois eavesdropping statute does not require suppression of electronically obtained evidence so long as Federal directives are followed and there is not collusion among the authorities to evade State law. *People v. Winchell* (1986), 140 Ill. App. 3d 244, 488 N.E.2d 620; *People v. Manna* (1981), 96 Ill. App. 3d 506, 421 N.E.2d 542.

■ The eavesdropping in the instant case was carried out by both State and Federal agents who complied with Federal law, but ignored Illinois directives. DEA was conducting an ongoing investigation in Jefferson County of "black tar" heroin. Defendant argues that the testimony of State and Federal officials involved in the eavesdrop presented differing bases for the obtaining of Federal eavesdropping authorization. We find no discrepancies which would warrant a finding of collusion between the agencies. The fact that cocaine was the drug purchased rather than "black tar" heroin is not relevant. The basis on which Federal authorization was obtained was the fact that defendant was an associate of John "Corky" Moore, who was a target of the "black tar" heroin investigation. This information was received from Larry Wade, an obviously reliable informant who had been paid at least $1,375 for information he supplied to both DEA and DCI. Larry Wade had already put into motion a drug buy of an eighth ounce of cocaine with defendant. We can find no evidence in the record that leads to the conclusion that there was collusion between Federal and State agents to circumvent Illinois requirements for eavesdropping. The eavesdropping was conducted in compliance with Federal law in an ongoing Federal/State investigation. Therefore, it was not error for the trial court to refuse to suppress the tapes.

Defendant's next issue on appeal is whether the trial court erred by denying defendant's request to attempt to impeach Larry Wade by refusing to allow defendant to present witnesses who would testify about a prior suicide attempt by Wade. Defendant argues that Wade's suicide attempt was in fact genuine. A suicide attempt is indicative of an irrational mind, and such an outward manifestation of a witness' mental condition is a valid area of inquiry for purposes of discounting the credibility of a witness. The State replies that the trial court properly denied defendant's request to present witnesses who would testify as to Wade's suicide attempt, as that testimony would constitute impeachment on a collateral issue.

■ In the instant case, Larry Wade was asked on direct examination about an incident in May 1986, at the Jefferson County jail

where he was found hanging with a towel around his neck. Wade had been in jail for approximately five days and had not yet seen a judge. According to Wade, this incident was a "stunt," not a real suicide attempt. He hoped that his faked attempt at suicide would lead him to seeing a judge. Defendant attempted to introduce the testimony of Leroy Hooker, Jr., Wade's cellmate at the time of the incident, and George Buretz, a guard at the jail, to impeach Larry Wade's testimony. The trial judge sustained the State's objection to the admissibility of this testimony, finding that Hooker's opinion of Wade's mental state was based on the observation of the suicide attempt alone and found this to be a collateral issue. However, after review of the offer of proof testimony of Leroy Hooker, Jr., we find that Hooker's observations were not based on the suicide attempt alone. Hooker testified that he had known Wade since 1984. He stated that he had always known Wade was a "strange guy" and that he "wasn't wrapped tight. That he had some problems." As to the suicide attempt, Hooker testified that he found Wade hanging by his neck from the bars of his cell with his feet off the floor. Hooker administered mouth-to-mouth resuscitation. Buretz's stipulation would have corroborated Hooker's testimony that the hanging incident was a genuine suicide attempt. Given the fact that the State's case hinged on Wade's testimony, we find that the trial court abused its discretion in not allowing the jury to hear Hooker's or Buretz's testimony. Buretz's testimony corroborated a sufficient part of Hooker's testimony and should have been allowed.

The State points out that this suicide attempt occurred over five months prior to the drug transaction in question, arguing that it is therefore too remote in time and thus collateral as to mental state. However, the testimony of Hooker and Buretz in conjunction with Wade's prior convictions, drug usage, and informant status severely damaged Wade's credibility. Further, Wade's own admission that this was a staged event to get him before a judge drastically undermined his credibility. Anyone who would perform such an act could have the capacity to lie under oath. The jury should have been allowed to hear all this testimony to decide what weight should have been given to Wade's testimony. For this reason alone, the cause needs to be reversed and remanded for a new trial. Given the importance of this testimony to the issue of credibility, we need not reach the issue of impeachment as to Wade's mental condition.

We move next to the issue whether defendant was denied his right to confront Larry Wade because during cross-examination Wade was not required to disclose where he lived. Defendant argues learn-

ing Wade's address would aid in leading defendant to other areas of questioning that would present a more complete picture of Wade, especially his questionable credibility. The State responds that this issue has been waived because defense counsel withdrew the question and did not raise this as an issue in his post-trial motion. We agree.

■ The court ruled that the witness, Larry Wade, did not have to reveal his street address when asked to do so by defense counsel. The trial court found that Wade's revelation that he was living in the Mt. Vernon area was sufficient. Defense counsel chose to withdraw the question rather than attempt to prove its relevance to defendant's case outside the presence of the jury. As pointed out by the State, the issue of Wade's address was not raised in any of defendant's post-trial motions. In order to preserve an issue for appellate review, it must be raised in a written post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) In the instant case, there is no issue left for appeal, as defense counsel withdrew the question. Even if the issue had not been waived, we cannot say that it was prejudicial error to sustain the State's objection. While it is generally accepted that a defendant has a right to ask a witness where he resides in order to identify him with his environment (*Smith v. Illinois* (1968), 390 U.S. 129, 131, 19 L. Ed. 2d 956, 959, 88 S. Ct. 748, 750), if a witness' life would be endangered due to the revelation of his address, the witness need not disclose that information. *United States v. Palermo* (7th Cir. 1969), 410 F.2d 468, 472; *United States v. Varelli* (7th Cir. 1969), 407 F.2d 735, 750.

The fact that Wade was a paid informant to both DEA and DCI unquestionably made him a target for those involved in illicit activities. This was dramatized during the trial when the proceedings had to be stopped in order to look for a court spectator who was observed "making gestures by curling his—extending his index finger and curling his other fingers around in the shape of a gun and moving his thumb as a trigger hammer in the direction of the witness as he testified." A search ensued, but the threatener could not be found. The gesture described in the transcript is not lost on this court. Wade was obviously in danger because of his status as an informant. In this instance, the trial court did not abuse its discretion in sustaining the State's objection to defense counsel's question requesting Wade's street address.

This leads us to the issue whether during the trial, the trial judge's conduct indicated hostility toward defendant to so prejudice defendant to require defendant's conviction to be reversed and remanded for a new trial. According to defendant, during cross-exami-

nation of Larry Wade, the trial judge slammed down his pencil, heaved a sigh, and made facial gestures in response to a question posed by defense counsel. According to defendant, these actions by the trial judge demonstrate that the trial court presumed the worst of defendant and unduly prejudiced him. We agree.

■ In a criminal case, it is not the province of the judge to convey by word or deed his opinions relative to determinations of fact, credibility of witnesses, and weight to be afforded their testimony. (*People v. Santucci* (1962), 24 Ill. 2d 93, 180 N.E.2d 491.) Defendant stated in his motion for a new trial that during cross-examination of Larry Wade, the trial judge "threw down his pencil on the stand and displayed obvious anger in the presence of the jury." Defense counsel did not object at the time "for fear of exacerbating the situation in the presence of the jury and calling to their attention the blatant display of improper judicial conduct by this court." This highlights the State's contention that the failure of defense counsel to timely object precludes our consideration of this question. We agree with the State that in most instances failure to make a timely objection would ordinarily prohibit review of the matter; however, there are instances, such as presented here, that it is not always practical or wise to object to unjudicial conduct before a jury. Less rigid application of the rule requiring timely and proper objection and preservation of rulings thereon should prevail where the basis for the objection is conduct of the trial judge. (*People v. Sprinkle* (1963), 27 Ill. 2d 398, 189 N.E.2d 295.) The *Sprinkle* court stated:

> "The making of an objection to questions or comments by a judge poses a practical problem for the trial lawyer. It can prove embarrassing to the lawyer, but, more importantly, assuming that most juries view most judges with some degree of respect, and accord to them a knowledge of law somewhat superior to that of the attorneys practicing before the judge, the lawyer who objects to a comment or question by the judge may find himself viewed with considerable suspicion and skepticism by the very group whom he is trying to convert to his client's view of the facts, thereby perhaps irreparably damaging his client's interests. If he fails to object, he may, on appeal, be faced, as defendant here is, with the claim that his failure to act has precluded consideration of the error, and it is not always a sufficient answer to this situation to say that the objection can be made and ruling secured outside the hearing of the jury. It is particularly incumbent upon the trial judge to exercise a higher degree of care in his comments regarding, or

interrogations of, witnesses before a jury in order to avoid influencing the jurors to any extent, and we therefore hold that a less rigid application of the rule requiring timely and proper objection and preservation of rulings thereon should prevail where the basis for the objection is the conduct of the trial judge than is otherwise required." 27 Ill. 2d at 400-01, 189 N.E.2d at 297.

At the hearing on the motion for a new trial, defense counsel described the acts he witnessed by the trial judge in response to a question asked by him during cross-examination. Defense counsel stated that at least six jurors took note of the court's action and made an obvious response to the court's actions. The prosecuting attorney also testified at the hearing. During cross-examination of Wade, he was seated at the table closest to Mr. Wade and his attention was focused on Wade. He could neither confirm nor deny the defense attorney's allegations about the pencil-slamming incident. On a later date, the court reporter for the proceedings in which the incident allegedly took place testified about her recollection of the event. The following is her estimation of what transpired:

"Q. During that cross-examination, what if anything unusual did you observe the court do?

A. The only thing that I remember, and the only reason I remember it is because at this time it happened, it startled me, was during the cross-examination, I remember out the the [sic] peripheral vision of my eye, I remember the Judge putting (Physical indication by the witness.) the pencil down on the desk or pen or something, but I assume it was a pen or pencil.

Q. When you say put down, do you mean slam down?

A. I would say that's—yes.

Q. It was not an inadvertent slip (Physical indication by Attorney McHaney.), was it?

A. Not like that. When it came down (Physical indication by the witness.), it was in the hand with—it wasn't—the pencil didn't drop by itself. It came down with a hand (Physical indication by the witness.).

Q. Do you recall that that occurred immediately after the question to Mr. Wade, where did you hide the eightball of cocaine? On the porch?

A. That's my recollection of where it happened.

Q. Was your back to the jury?

A. I sit—in Courtroom A, the jury is over here and the way I was facing, because there was a witness on the stand, I

was turned more towards the—angled more towards the court and would be towards Defense Counsel table with—where I had a peripheral vision of the far extension of the jury and then I could see the court, you know, the witness out of the corner of my eye.

Q. To view the jury, you would have had to have turned your head, wouldn't you?

A. Right. Well, with the exception of the tail end of the jury as I described, the far end of the jury, not the end closest to me but the point farthest away. I could see them out of the peripheral vision, but to see the ones behind me, I would have had to turned my head."

Judge Krause stated that he had no recollection of such events. He mentioned that he sometimes experienced respiratory problems which forced him to breath through his mouth, an act that might be interpreted by some as sighing.

■ The most enlightening testimony in our mind is that of the court reporter, an experienced courtroom observer and an unbiased witness. The fact that she was startled by the judge's actions, especially in the midst of some "rather heavy cross-examination," leads us to believe that the trial court acted improperly. It is apparent to us that the jury could infer from this that the judge believed Wade and that the cross-examination that was taking place should not be given consideration.

Finally, during closing argument defense counsel was explaining to the jury why he was angry while cross-examining Larry Wade. Defense counsel stated, "There was anger. Because I believed that—." The State objected to what defense counsel believed and the trial court sustained the objection. Defendant argues that this ruling effectively stymied defendant's case by not allowing counsel to pursue what was perhaps an important argument. Because defense counsel could not complete the sentence, we have no way to know upon what defense counsel was going to express an opinion. If a prosecutor is allowed to express an opinion during closing argument based on facts in evidence (*People v. Jones* (1982), 108 Ill. App. 3d 880, 888, 439 N.E.2d 1011, 1018), clearly a defense attorney should have such latitude. Even though we will never know exactly what the defense attorney had planned to say, we find the court's ruling premature.

We conclude that the actions of the trial judge complained of here were unnecessary. They did not constitute harmless error. Defendant may have been prejudiced in the eyes of some or possibly all of the jurors, and the cause must be remanded for a new trial.

Because of this ruling, we need not address defendant's contention that the trial court abused its discretion in sentencing defendant to an extended term of 12 years.

For the foregoing reasons, this court reverses the judgment of the circuit court of Jefferson County and remands for a new trial.

Reversed and remanded.

LEWIS, J., concurs.

JUSTICE HOWERTON, specially concurring:

I address only the issue raised by defendant's thwarted attempt to introduce Leroy Hooker's testimony that he found Larry Wade hanging by his neck from the bars of his cell with his feet off the floor and that he gave Wade mouth-to-mouth resuscitation, and that Wade was a "strange guy" and "wasn't wrapped tight."

Hooker's testimony was offered for a dual purpose.

The first purpose was to impeach Wade's testimony by showing that he had a mental condition, thereby raising the inference that Wade's perceptions and memories of the events about which he testified were faulty. Mental capacity is a proper subject for lay opinion testimony. However, Hooker's testimony was not admissible for this purpose for two reasons: firstly, a lay witness can give an opinion as to mental condition only after stating facts in sufficient detail to show knowledge of the mental condition of the person in question (*Walker v. Struthers* (1916), 273 Ill. 387, 112 N.E. 961; see E. Cleary & M. Graham, Handbook of Illinois Evidence §704.3, at 379 (3d ed. 1979)); and secondly, the mental condition is not relevant to credibility if it is too remote in time from the events about which testimony is given. (*People v. Helton* (1987), 153 Ill. App. 3d 726, 506 N.E.2d 307.) In this case, "strange guy" and not being "wrapped tight" do not state facts. Furthermore, Hooker was testifying about Wade's mental condition five months before the events about which Wade was testifying; this is too remote. Hooker's observations would have to relate to the time of Wade's perceptions and the formation of his memory about the events in order to be relevant. *People v. Helton* (1987), 153 Ill. App. 3d 726, 506 N.E.2d 307.

Hooker's testimony is admissible, however, for its second purpose, namely, to raise an inference that Wade lied on the witness stand when on direct examination he testified that his suicide attempt was a "stunt" to get him in front of a judge. That portion of Hooker's testimony wherein he stated he found Wade hanging by the

neck with his feet off of the ground and that he saved Wade's life by administering mouth-to-mouth resuscitation directly contradicts Wade on a matter Wade injected into the case, and therefore, is not collateral. That contradiction attacks Wade's credibility and is admissible.

I otherwise concur.