THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LORENZO HILL et al., Defendants-Appellants.

First District (3rd Division)   No. 1—94—2929

Opinion filed December 6, 1995.

CERDA, J., dissenting.

David S. Mejia, of Chicago, for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Latisha Foster, and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

The brothers Hill (defendants) were convicted by a jury of the attempted first degree murders of Jose Tanon and Elizabeth Perez, aggravated battery with a firearm, and aggravated discharge of a firearm. Defendants were sentenced to 12 years' imprisonment for each count of attempted murder, and 12 years for aggravated battery with a firearm, the sentences to run concurrently.

On appeal, defendants raise issues as to whether: (1) the evidence was sufficient to establish the element of specific intent to kill Elizabeth Perez required to sustain a conviction for attempted first degree murder; (2) the testimony of witnesses Jose Tanon and Yesenia Chavallo was inconsistent, impeached, and improbable, and thus insufficient to establish defendants' guilt beyond a reasonable doubt; and (3) allegedly erroneous jury instructions on attempted first degree murder require reversal.

Jose Tanon (Jose) testified that on April 15, 1993, at approximately 2 p.m., he observed Lorenzo Hill selling narcotics in front of Jose's two-flat building located at 1727 Artesian Street in Chicago. Jose, his common-law wife, Elizabeth Perez (Elizabeth), and their three young children occupied the building's first floor, while Jose's relatives lived on the second floor. Jose knew defendants Lorenzo, a/k/a "Soso," and Ramon, a/k/a "Moni," Hill, both in their mid-twenties, "from the neighborhood" in which all had resided for 15 years.

Jose approached Lorenzo at the conclusion of a drug transaction and told him "I don't want nobody dealing in front of my house." Lorenzo replied, "I can deal anywhere I want, and if you (Jose) don't like it, I'll f... you and your family up." Jose and Lorenzo then parted company.

At 8 p.m. that evening, Jose was reading on the second floor of his building, which was illuminated, while Elizabeth and the children were on the first floor. Jose heard gunshots fired at his building and, from the second-floor window, observed a late model turquoise Oldsmobile driving away. Jose could not identify the car's occupants. Jose later observed bullet holes in the front wall of the first-floor bedroom, living room, and windows.

Police officer Sebastian responded to Jose's phone call reporting the incident, spoke briefly with Jose, took note of the bullet holes, and "canvassed the area" before leaving.

Fifteen minutes later, at approximately 9 p.m., Jose heard a car brake sharply outside his building, followed by rapid-fire gunshots. Jose, seated near the second-story window, observed Ramon Hill firing a handgun from the open passenger-seat window of a red, four-door Oldsmobile, and Lorenzo Hill firing a handgun through the car's rear window. Jose testified that Ramon, upon observing him looking out of the second-floor window, aimed and fired two shots in his direction. The car then sped off.

Elizabeth testified that when the shots were fired, she grabbed her children and "threw [her] body on top of them." Elizabeth then "felt a sharp pain in [her] left calf." Elizabeth observed that the children were "hysterical" and "vomiting" but otherwise unharmed, and that her calf was red and beginning to swell. Elizabeth screamed, "I've been shot."

Jose ran downstairs, observed that the front window was shattered and his family was hysterical, and called the police. Officers Flores and Domenech responded and asked Elizabeth if she wanted medical attention for the injury to her left calf. Elizabeth declined, not wishing to leave her children to go to the hospital. The officers

observed several bullet holes throughout the first-floor apartment, including three in the front door. Jose identified Ramon and Lorenzo as the shooters and accompanied the officers to the Hill residence, which was, at the time, unoccupied. Jose told the officers that the defendants had threatened him earlier in the day.

At approximately 8:50 p.m., Yesenia Chavallo (Yesenia), Jose's sister, was parking her car in the alley adjacent to the Artesian Street residence, when she observed, from "about 20 feet" of "well-lighted" pavement, the red Oldsmobile with the Hill brothers firing from its open windows. Yesenia's boyfriend was with her and the two retreated down the alley. Yesenia testified that the Hills fired several shots in succession. Yesenia spoke with the officers and independently identified the defendants.[1]

Officer Flores, as the State is quick to note, is a "rookie" with 18 months of experience. He wrote the reports on this incident which contained some inconsistencies, omissions, and inaccuracies. His first report did not list Elizabeth as a victim, and indicated that the defendants threatened Jose two weeks prior to, and not on the day of, the shooting. Flores was asked by his superiors to "rewrite the report," which he did, the revised version indicating that Elizabeth was "struck by a bullet" causing "minor bruising" to her calf. Flores testified that the mistakes in the initial report were "oversights."

At trial, each defendant presented an "alibi" witness. Luz Castro, Lorenzo's girlfriend and mother of his child, testified that Lorenzo picked her up from work at 5 p.m. on the day of the shooting. Leida Rodriquez, Ramon's girlfriend, testified that Ramon picked her up from work around 9:15 p.m. on the night of the shooting.

Ronald Recupido, who lived at 1734 W. Artesian, across the street and a few houses down from Jose's building, testified that he heard "shots" around 8:30 or 9 p.m. on the night in question. Ronald saw a car drive past, brake sharply in front of Jose's house, and two men fire from the car's open windows. Ronald, however, testified to his "belief" that the car's occupants were "around 150 pounds" and were wearing baseball hats turned backwards. Ronald stated that the defendants, seen in open court, were "much larger" than the men he saw in the car.

Over defendants' objection, the jury was instructed:

"To sustain the charge of attempt first degree murder of Jose Tanon, the State must prove the following propositions:

---

[1]Apparently the Hill brothers, each over 6 feet and 300 pounds, are readily identifiable.

(1) That defendant performed an act which constituted a substantial step toward the killing of Jose Tanon; and

(2) That defendant did so with the intent to kill Jose Tanon.

To sustain the charge of attempt first degree murder of Elizabeth Perez, the State must prove the following propositions:

(1) That the defendant performed an act which constituted a substantial step toward the killing of Elizabeth Perez; and

(2) That defendant did so with the intent to kill Elizabeth *or another*." (Emphasis added.)

During deliberations, the jury sent out a note asking, "Does first degree attempted murder define 'intent to kill an individual' as *any* person or a particular intended victim?" (Emphasis in original.) Defendants moved for a directed verdict based on improper jury instruction which was denied by the trial court.

The jury sent out a second note questioning the instructions as to Elizabeth which stated, "Jury instruction sheets for attempt first degree murder of Jose Tanon and Elizabeth Perez are different. See second proposition. 'Kill Elizabeth or another.' On Jose Tanon, it ends, 'to kill Jose Tanon.' Shouldn't these be the same? Shouldn't they both end 'or another'? What's the difference if another is included or deleted?"

The trial court sought to cure the apparent confusion by presenting the jury with a note stating, "The instruction as to Elizabeth Perez is based upon the argument of transferred intent. The instruction as to Jose Tanon is not. Please follow the instructions."

The jury returned, finding each defendant guilty of attempted first degree murder (two counts), aggravated discharge of a firearm, and aggravated battery with a firearm.

Defendants first argue that the evidence was insufficient to establish the element of specific intent to kill Elizabeth and thus the conviction for her attempted murder must be reversed.

Defendants correctly set out the law relating to attempted murder. An individual commits the offense of attempted murder when, with specific intent to kill, he does any act which constitutes a substantial step toward the commission of murder. (720 ILCS 5/8—4 (West 1992).) Proof of a specific intent to kill is an indispensable element of attempted first degree murder. (*People v. Trinkle* (1976), 40 Ill. App. 3d 730, 353 N.E.2d 18, *aff'd* (1977), 68 Ill. 2d 198, 369 N.E.2d 888.) While the question of a defendant's intent is one for the trier of fact, an attempted murder conviction will be reversed when the requisite intent is not proven beyond a reasonable doubt. *People v. Henry* (1971), 3 Ill. App. 3d 235, 278 N.E.2d 547.

Although defendants contend they lacked a specific intent to kill Elizabeth, it is difficult to ignore the notions that (1) defendants threatened *both* Jose and "his family," and (2) spraying a house with gunfire constitutes a substantial step toward the commission of murder. Further, the defendants appear to ignore the theory of transferred intent explicitly applied to the count for Elizabeth.

■ The law is well settled that where a person shoots at one with intent to kill and murder, but kills one whom he did not intend to injure, he is not absolved from answering for the crime of murder. (*People v. Marshall* (1947), 398 Ill. 256, 75 N.E.2d 310.) Moreover, the doctrine of transferred intent is applicable in attempted murder cases. (See *People v. Burrage* (1994), 269 Ill. App. 3d 67, 645 N.E.2d 455; *People v. Humes* (1979), 78 Ill. App. 3d 255, 397 N.E.2d 130; *People v. Swaney* (1971), 2 Ill. App. 3d 857, 276 N.E.2d 346.) Accordingly, if the evidence established that defendants had a specific intent to kill Jose, which the jury found, then that intent is transferred to Elizabeth under the doctrine of transferred intent, and defendants' convictions were proper. Thus, the only way to challenge the sufficiency of their convictions for the attempted murder of Elizabeth is to show that the State did not prove, beyond a reasonable doubt, their specific intent to kill Jose.

The necessary specific intent to kill may be shown by surrounding circumstances, including the character of the assault and the use of a deadly weapon. (*People v. Migliore* (1988), 170 Ill. App. 3d 581, 525 N.E.2d 182.) Such intent may be inferred if one willfully does an act, the direct and natural tendency of which is to destroy another's life. (*Migliore*, 170 Ill. App. 3d at 586.) It is the jury's function to determine the existence of the requisite intent, and that determination will not be disturbed on appeal unless it clearly appears that a reasonable doubt exists as to the defendant's guilt. *Migliore*, 170 Ill. App. 3d at 586.

■ Examination of the circumstances surrounding the "drive-by" supports the jury's finding of a specific intent to kill. The jury considered Lorenzo Hill's threat to Jose and his family on the day of the shooting, and the *two* separate drive-by shootings. The first from a "turquoise color Oldsmobile or Chevrolet" at 8:30 p.m.,[2] followed a half-hour later by a second drive-by from a red four-door Chevrolet. This indicates that defendants were not content with the results of the first drive-by, which in isolation *might* have been viewed as a

---

[2]Leida Rodriquez, Ramon's girlfriend, owned a "metallic blue" Chevy Cierra which Ramon was driving on the day of the shooting.

warning or an act of general, unfocused mayhem. The second incident rather clearly demonstrates that merely shooting up Jose's house was unsatisfactory. The logical inference being that defendants intended actual harm to the building's occupants, which, when automatic weapons are involved, may reasonably be interpreted as an intent to kill.

Additionally, the jury heard Jose's testimony that Ramon Hill "looked up at me in the second story window and fired some shots at me." Investigators found several bullet holes near and above the second-floor window. This case is very different from *People v. Trinkle*, cited by defendants, where a heavily intoxicated patron fired shots at the exterior of the bar from which he had just been "cut-off." There, the appellate court reversed the conviction for attempted murder, finding no specific intent to kill. The court reasoned that the *Trinkle* defendant had an unfocused aim directed at the building housing the bar rather than a specific individual within the bar. (*Trinkle*, 40 Ill. App. 3d at 734.) In the instant appeal, defendants threatened Jose and his family, not their property, and the second drive-by suggests that property damage alone was not the desired result. Intent can be inferred when it has been shown that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life. (*People v. Winters* (1986), 151 Ill. App. 3d 402, 502 N.E.2d 841.) There was ample evidence to justify the jury's concluding that defendants had a specific intent to murder Jose.

Because the jury properly found that defendants had the requisite intent as to Jose, and this intent is transferred to Elizabeth, defendants' challenge to their convictions for the attempted first degree murder of Elizabeth is rejected.

In fact, argument can be made that defendants were chargeable with the attempted murders of the children as well. Defendant Lorenzo threatened Jose's family. Certainly Jose's three children are encompassed by this threat, and their presence amidst the defendants' indiscriminate gunfire, shielded by Elizabeth's body, suggests that defendants made a substantial step toward their murder. At oral argument, counsel for defendants argued, in support of his position that there was no specific intent to kill Elizabeth, that extension of defendants' murderous intent to the children highlighted the defects in the reasoning and application of the doctrine of transferred intent. In response, we note that extension of the specific intent to kill Jose to the children proceeds quite logically. They were no less the object of defendants' intent than Elizabeth, and we see no distinction in the fact Elizabeth was struck by a bullet. It is not the function of this court to retry defendants on charges not brought by the State. We

note, however, that had defendants been charged with three additional counts of attempted murder, one for each child present, we would not have hesitated to affirm those convictions given the facts of this case.

Defendants next challenge the reliability of the testimony of Jose and his sister Yesenia. Defendants argue that their testimony was "inconsistent, impeached, and improbable, and thus insufficient to establish defendants' guilt beyond a reasonable doubt."

A conviction for attempted murder will be reversed where the evidence presented is so unsatisfactory or improbable as to raise a reasonable doubt of the defendant's guilt. (*People v. Helton* (1987), 153 Ill. App. 3d 726, 506 N.E.2d 307.) The critical inquiry when reviewing challenges to the sufficiency of the evidence is whether, construing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

The complained-of inconsistencies include the fact (1) Lorenzo may have threatened Jose two weeks prior to, and not on the day of, the shooting; (2) Elizabeth was not listed as a victim in the initial police report; and (3) Yesenia made a pretrial statement that she did not "see anything" at 8:30 on the night of the shootings.

It is the jury's function to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v. Young* (1989), 128 Ill. 2d 1, 51, 538 N.E.2d 453.) It is not the function of the reviewing court to retry the defendant or to substitute its judgment as to the weight of the evidence for that of the trier of fact. *People v. Eyler* (1989), 133 Ill. 2d 173, 549 N.E.2d 268.

■ The inconsistencies raised by defendants came out of Officer Flores' initial incident report. Although the State is unconvincing, and perhaps disingenuous, in its attempt to "pin" the errors entirely on Flores, nothing raised by defendants affects the validity of the jury's verdicts. Moreover, there is no question as to the admissibility of the evidence considered by the jury. They heard the arguments raised here on appeal and rejected them in the course of rendering guilty verdicts. We will not disturb those verdicts on the grounds argued by defendants.

Defendants next assert error in the jury instructions on attempted first degree murder. Defendants argue that the State was "wrongly permitted, over objection, to urge guilt to attempt first degree murder of Elizabeth based on the *legally irrelevant* theory of transferred intent." (Emphasis added.) Further, defendants claim

the trial court's instructing the jury on transferred intent is reversible error. This argument essentially revisits the one made earlier contending defendants lacked a specific intent to kill Elizabeth. Contrary to defendants' characterization of the "legal irrelevancy" of the transferred intent doctrine, this doctrine remains alive and well and was applied correctly by the State, trial court, and jury. See *People v. Burrage* (1994), 269 Ill. App. 3d 67.

■ This case presents a routine example of the doctrine's application, and one which speaks favorably to the policy considerations behind the doctrine. The jury found that defendants had a specific intent to kill Jose, and spraying his home with bullets was a substantial step in pursuit of this intent, which was transferred to Elizabeth. The alleged "confusion" on the part of the jury, as seen in their correspondence with the trial court, was remedied by the trial court's explanation of the differences in the language "or another" included in the instruction relating to Elizabeth. See *People v. Franklin* (1992), 225 Ill. App. 3d 948, 588 N.E.2d 398 (trial court properly gave attempted murder jury instructions including term "or another").

Defendants argue relatedly that the State's failure to allege transferred intent in the charging instrument "effectively allowed the State to amend the charge and to prosecute defendants omitting an essential element of its own indictment or information." Contrary to defendants' assertions, a person may be properly convicted under the theory of transferred intent even if the State does not specifically allege that theory in the charging instrument. *People v. Franklin*, 225 Ill. App. 3d 948; *People v. Forrest* (1971), 133 Ill. App. 2d 70, 272 N.E.2d 813.

For the reasons set forth above, we affirm the trial court's judgment and sentence on the jury's verdicts.

Affirmed.

TULLY, J., concurs.

JUSTICE CERDA, dissenting:

I respectfully dissent. I do not believe that it was proven beyond a reasonable doubt that defendants had the specific intent to kill Elizabeth Perez in order to be guilty of attempted murder. The evidence in this case was that shots were fired at the house at 1727 North Artesian in Chicago. Jose Tanon, the husband of Elizabeth Perez, told Officer Flores that at 8:30 p.m. on April 15, 1993, he heard shots while he was upstairs with the lights on reading a book. He later saw bullet holes in the first-floor apartment. After the police

had come and then left, Tanon was again on the second floor when he heard shots and actually saw Ramon Hill and Lorenzo Hill shooting into the downstairs apartment. Then Tanon testified that Ramon Hill saw him upstairs by the window and then pointed his gun up towards him and shot twice. Elizabeth had been shot when the defendants fired shots into the downstairs apartment. At the time defendants fired shots into the first-floor apartment, there was no evidence that the lights were on in any part of the apartment or whether Elizabeth Perez and the defendants could see each other or whether the defendants saw any person on the first floor or whether they shot in any person's direction on the first floor. There simply was no evidence of this.

In the case of *People v. Burrage* (1994), 269 Ill. App. 3d 67, 645 N.E.2d 455, the court stated regarding defendant Redmond that "the evidence did establish that during this ongoing offense he drove onto the scene within seconds after Burrage fired shots toward the building, he fired three shots in the same direction, they both aimed at Andre and that, after the shooting, Burrage got into the automobile driven by Redmond and the two of them fled the scene together." (*Burrage*, 269 Ill. App. 3d at 74.) The court further stated: "The evidence establishes that Burrage had the intent to kill Andre. However, three-year-old Donte Hinton was shot instead. Burrage's intent to kill Andre is transferred to Donte under the doctrine of transferred intent. Illinois law has held that this doctrine is applicable in attempted murder cases." *Burrage*, 269 Ill. App. 3d at 76.

In our case, the evidence was that shots were first fired at the first-floor apartment. There was no evidence that any occupant of the first floor was seen by defendants or anyone else. Defendants did not shoot at any person on the first floor when the victim was hit by a random discharge of one of the defendant's weapons. One cannot be guilty of attempted murder for firing at random at a building.

In the case of *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888, a bartender, believing defendant to be intoxicated, refused him further service. Defendant purchased a handgun and returned to the area of the tavern, fired a shot at the building and wounded a patron within. He was convicted of attempted murder. The supreme court stated: "It is not sufficient that the defendant shot a gun 'knowing such act created a strong probability of death or great bodily harm to Gayle Lane or another.' If this were the test, then a defendant who committed a battery with knowledge that such conduct could cause great bodily harm would be guilty of attempted murder." (*People v. Trinkle*, 68 Ill. 2d at 201.) The court noted that there was no evidence the defendant knew someone was standing behind the door to the

bar. (*Trinkle,* 68 Ill. 2d 198.) The appellate court decision that the indictment was fatally erroneous was affirmed.

The evidence in this case only proved defendants had the specific intent to kill Tanon on the second floor.

On the basis that there was no evidence to prove defendants had the specific intent to kill Elizabeth Perez, I would reverse and vacate their convictions for attempted first degree murder.