# IN THE COURT OF APPEALS OF IOWA

No. 19-0911
Filed February 16, 2022

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ANTHONY ALEXANDER MONG,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, William P. Kelly, Judge.

Anthony Mong appeals his convictions for attempted murder, intimidation with a dangerous weapon, willful injury causing bodily injury, and going armed with intent. **REVERSED IN PART, AFFIRMED ON CONDITION IN PART, AND REMANDED.**

Cathleen J. Siebrecht of Siebrecht Law Firm, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.

Heard by Bower, C.J., Badding, J., and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2022).

**BOWER, Chief Judge.**

Anthony Mong appeals his convictions for attempted murder, intimidation with a dangerous weapon, willful injury causing bodily injury, and going armed with intent. Mong contends the jury pool did not represent a fair cross-section of the community; the court erred in denying his motion to compel witness testimony; and there is insufficient evidence of specific intent to support his convictions for attempted murder, intimidation with a dangerous weapon, and willful injury causing bodily injury.

Mong is entitled to access the information needed to enforce his constitutional right to a jury trial and was not given access to that information, we will remand to give him an opportunity to develop his arguments. We affirm the district court's denial of Mong's motion to compel. Finally, there is no evidence of a specific intent to harm or kill Shane Woods[1] and, thus, there is insufficient evidence to support the charges of attempted murder, intimidation with a dangerous weapon, and willful injury causing bodily injury. We reverse those convictions. We conditionally affirm the conviction for going armed with intent and remand the matter to the district court for development of the record on the challenge to the composition of the jury.

---

[1] When multiple persons referenced in this opinion share a last name, we will refer to them by their first name. This includes Shane Woods.

## I. Background Facts and Proceedings.

Mong was present when Shane was shot in the back in 2018. Mong was charged with attempted murder, intimidation with a dangerous weapon, willful injury causing bodily injury, and going armed with intent.

On the first morning of trial, April 1, 2019, Mong filed a motion to compel Tyrone Hughes Jr. to testify, explaining the State had attempted to depose Hughes but Hughes invoked his Fifth Amendment rights against self-incrimination and indicated he was not going to answer questions other than identification questions. Hughes again invoked his Fifth Amendment rights when the defense attempted to ask him questions. The defense presented a list of proposed questions to Hughes's attorney, and Hughes continued to invoke his right against self-incrimination. The list of questions is not included in the appellate record. However, the State's argument against the motion to compel provides some insight:

> Tyrone Hughes is in custody, charged with murder in the first degree. Tyrone Hughes is in the same pod as this defendant. They have been together since December 12th of 2018. It wasn't until last week, Sunday, that counsel e-mailed me a letter that Tyrone wrote, trying to exonerate the defendant, saying that some guy by the name of Brandon Henlon told him that he committed the crime, not the defendant.
> When we inquired about Brandon Henlon, we were told that he was dead. So a dead person tells the defendant's cellmate that he committed the crime and now they want the cellmate to testify.
> We attempted to depose him, not knowing how the court is going to rule. We deposed him on Friday of last week. And as counsel so correctly stated, he came to depositions with his attorney, Ms. Smith, who is here. And when we attempted to question him, he invoked his Fifth Amendment right.

Hughes's counsel informed the court she had advised her client to invoke his right against self-incrimination "as it pertains to any substantive questions which, if the court read the deposition, started immediately after [the prosecutor] asked him what his name was and where he was currently residing." With respect to Mong's defense counsel's request that Hughes be required to invoke his right on a question-by-question basis, Hughes's counsel contended such a process "would lead Mr. Hughes saying things that potentially were favorable to the defense and rendering the State with the inability to cross-examine him, and that's where I have concerns as they pertain to Mr. Hughes'[s] trial as it comes up in August."

The court ruled:

I understand [the defendant] does have very important rights here. Your client is on trial here today. And in looking at his rights, also comparing those to Mr. Hughes's rights, especially his Fifth Amendment right not to testify or not to incriminate himself, through the advice of counsel, Mr. Hughes has reviewed the questions you wished to submit to him. He has chosen to assert his Fifth Amendment right. His counsel has advised him to assert his Fifth Amendment right. . . .
    In our case, Mr. Hughes has indicated an intent to assert his right against self-incrimination before a jury. And our Iowa Supreme Court held that the district court correctly prohibited the defense from calling a witness who has predetermined to invoke his privilege against self-incrimination.
    So based on *State v. Bedwell*, [417 N.W.2d 66, 69 (Iowa 1987),] and based on the reasons provided by the State's resistance, the motion to compel witness Tyrone Hughes Jr., to testify at trial is denied at this time.

Prior to jury selection, the defense challenged the make-up of the jury panel, noting the defendant was African American and only one potential juror was non-

white, but acknowledging "we don't have the information available" to show systematic exclusion. Defense counsel asserted:

> We would indicate that the test, as it currently stands, makes it very difficult to establish the third prong. But given the results of the panel, the absolute disparity, the comparative disparity, the fact that there's only one African-American juror on this entire panel, we would urge that is proof of systematic exclusion and, therefore, we're raising a challenge to the panel.
> THE COURT: And your remedy is what?
> [DEFENSE COUNSEL]: Pick a new panel.

The State objected, arguing the focus must be on the jury pool, not an individual panel, and the defense was required to show an intentional and deliberate exclusion of qualified African Americans jurors. The State suggested the defense be allowed to review information from court administration and "articulate why there's a systematic exclusion of African-Americans" or proceed with trial.

The defense responded, "[T]he only evidence that I was raising was just the fact of the panel we're looking at. . . . I'm asking the court to provide additional members of the African-American community for this panel." The court denied that request but recessed to allow time for court administration to provide additional information concerning the jury pool.

When court resumed, the court explained:

> The court has requested the information, to give to defense counsel, in regards to the makeup of the pool that was called for jury duty. Our understanding is that 195 people showed up for jury service today. Once that information is complete, I will forward that on to defense counsel.
> In order to determine the makeup of the race of the Polk County citizens who have shown up for jury duty, I'm going to send you all of their bios, and you'll just have to go through and figure out what their race is.

It's not sorted. It can't be sorted. So I think 210 were originally called and 195 showed up. But the reason I'm telling you that is, you'll just have to count. So I don't know what the actual number is.

At this time I will take evidence on systematic exclusion of African-Americans from this pool.

Defense counsel repeated he had no additional evidence of systematic exclusion at hand, and the jury selection process continued. After jury selection was completed, the empaneled jury included one non-white member. Defense provided no further evidence of systematic exclusion, and the court again rejected the defense's challenge to the jury pool.

At trial, evidence was presented that from November 2017 until just before Shane was shot on June 1, 2018, Mong had an intermittent dating relationship with Madison Cobb. During the same time period, Cobb and Ricco Martin were "friends with benefits." Martin received thirty to forty intimidating text messages from Mong during that time, leading Martin to change his phone number. In May, Martin and Mong had an argument in Cobb's presence, during which Mong told Martin that "he wasn't going to fight me; he was going to shoot me." That was the last time Martin saw Mong before June 1.

Martin testified that on the evening of June 1 he was outside the home of Cobb's father, Todd Hines, and standing in the yard with Todd, Todd's nephew David Woods, and David's father (Shane) when Mong arrived. He saw Mong drive by, make a U-turn, and come back. Todd told Martin to go inside, but he did not. Martin saw Mong jump out of the car. He saw Mong run behind a tree and shoot. Shane was hit. Martin believed that Mong was trying to shoot him—not Shane.

Todd testified that at about 8:00 p.m. on June 1 he was outside in his yard with David, Shane, and Martin. All of them had been smoking marijuana. The men in the yard saw Mong driving down the street in a Hyundai Sonata, music blaring.[2] Todd had been present a couple weeks earlier when Mong told Martin "he would not fight him; he was just going to shoot him." Mong drove past the house, went around the corner, turned around, drove back to Todd's house, and parked on the street. Mong exited the car with something in his hand and walked toward the house. Todd testified he thought Mong was going to shoot Martin. Todd ran inside to his bedroom and got his handgun. He had the gun tucked into the back of his waistband when he went back outside. There, he saw Mong walking to his driveway with a gun. Todd told Mong, "Don't do this." He repeated the warning. Todd stated, "I was going to draw and point it towards him, Mr. Mong, and [Martin] had grabbed my arm and reminded me there were children playing outside in the neighbor's yard." Todd dropped the gun, which Martin retrieved, and Todd ran into the house. Todd was inside the house by the sliding door and looking outside when he heard two shots. He told Shane to run because Mong was shooting, and Shane said, "I'm hit." Todd testified he told his wife Heather to call 911 and then realized he had his phone in his pocket; he called 911.

Heather Hines testified she was called outside the night of the shooting at about 8:00 p.m., found Shane had been shot, and Todd told her to call 911, which she did. She knew of the conflict between Mong and Martin a few weeks prior. At some point after the shooting, Martin gave her Todd's gun and asked her to "put it

---

[2] The vehicle belonged to Mong's girlfriend, Rachel.

up for Todd." She placed the gun under their mattress and did not tell the police about it that evening.

David also testified he saw Mong drive by the Hineses' house. Mong gave the men "a little stare down" as he drove by. David saw Mong turn around at the school, then Mong "cranked his music and came back." David believed "something was going to happen," so he went to the garage and grabbed a baseball bat. While David was in the garage, he heard a gunshot, heard Todd say, "He's got a gun," then heard his dad yell, "I'm hit. I'm hit." David left the garage and saw Shane was bleeding. He saw Mong getting into his car and chased after the car with the baseball bat.

Shane testified he saw Mong drive by, pull up in front of the yard, but then drive on. He watched as Mong went around the corner, turned around, and came back. This time, Mong stopped in front of the house, got out of the car, and walked to the back of the car. By that time, Todd had gone into the house and come back out. Shane heard Todd say, "Don't, Tony, don't." Shane looked and saw that Mong was at the driveway with a gun pulled. When he saw that Mong had a gun, he did not run because he did not think he had a problem with Mong. Shane just turned around to walk back toward the house. He heard a shot. Shane was hit on the left side of his back; the bullet exited through his chest and travelled through his arm. At the time he was shot, Shane was approximately six to eight feet from Martin, who was standing by the front of the deck.

Mong took the stand in his own defense. He testified he was storing a red Cadillac at the Hineses' residence. Todd had planned to help Mong fix the car.

After Mong and Cobb broke up, Mong wanted his car back. Mong testified that he went to Todd's house on May 31 and talked to him about getting the car back. Todd told him to come back on the weekend because Cobb had the title and keys to the car and she was not home.

Mong stated that after he got off work on June 1, he picked up Brandon Henlon, dropped his girlfriend off at work, smoked marijuana for a while, and then he and Henlon drove around. Mong decided to go pick up the Cadillac. When they got to the Hineses' residence, he saw Todd, Martin, Shane, and David all sitting outside. He pulled up in front of the house and parked behind a big tree in the yard. He told Henlon to stay in the car and got out with his cell phone in his hand. Mong testified he was texting and then saw Todd with a gun. He saw Martin grab the gun, so Mong ducked behind the tree. Mong testified that while behind the tree, he heard one shot fired from the direction of the men in the yard. Then, he heard a second shot fired from behind him, from his car. Mong ran back to the car and drove off. Mong saw that Henlon had a gun in his hand.

Mong was afraid that someone would come after him or shoot him, so he stayed in a hotel until morning. A friend drove him to Las Vegas, where his mother lived. He denied that he had a gun on June 1, he intended to shoot anyone at the Hineses' residence, he intended to fight anyone there, or he fired a shot at anyone. He testified he did not learn that Shane had been injured until a day or two after he arrived in Las Vegas. He did not try to contact the police in Iowa because Henlon was his best friend whom he believed had saved his life and he did not want to get Henlon in trouble.

Mong was arrested in Las Vegas two months after the shooting. Henlon died in February 2019—before Mong's trial. Mong did not tell the police Henlon had a firearm at the scene until after Henlon died. The evidence showed there was a live round of ammunition in the car Mong and Henlon were driving and a shell casing was found in the street.

Mong filed a motion for judgment of acquittal after the close of the State's case-in-chief and again at the close of the evidence, asserting there was insufficient evidence Mong was armed or that he had specific intent to support the charges of attempted murder, intimidation with a dangerous weapon, or willful injury. The court denied the motions.

The marshalling instructions on the elements of attempted murder, intimidation with a dangerous weapon, and willful injury causing serious injury each included a statement that Mong "specifically intended to cause the death of Shane Woods." The instructions on the elements of going armed with intent provided, "The defendant was armed with the specific intent to use the firearm against another person." The jury instructions included one on the doctrine of transferred intent.

The jury convicted Mong on all charges.

In his motion for new trial, defense counsel asserted the convictions concerning attempted murder, intimidation, and willful injury were improper under the marshalling instructions given, explaining in part:

> And to speak briefly further, there were a couple of instructions where it did allow for transferred intent, and those were specifically laid out in my motion, assault causing bodily injury as well as the assault. And Instruction 31 and 24 refer to "another" and that

would allow for transferred intent. And these others, we are urging, would not.

So I'm not saying—we are not saying that the instructions were inappropriate in the way that they were drafted. We are saying that the jury's verdict is contrary to the weight of the evidence based upon those instructions.

The court denied Mong's motion for a new trial and imposed sentences.

Mong appeals, contending the court erred in denying his challenge to the makeup of the jury and in denying his motion to compel the testimony of Tyrone Hughes Jr. He also asserts there is insufficient evidence of specific intent directed toward Shane Woods to support his convictions for attempted murder, intimidation with a dangerous weapon, and willful injury causing bodily injury. He does not challenge the sufficiency of the evidence for the conviction for going armed with intent.

**II. Scope of Review.**

Claims of systematic exclusion of a distinctive group from a jury pool raise a constitutional question and are reviewed de novo. *State v. Plain*, 898 N.W.2d 801, 810–11 (Iowa 2017). So, too, we review de novo Mong's claim that his right to compulsory process was violated. *State v. Heard*, 934 N.W.2d 433, 439 (Iowa 2019). We review sufficiency-of-the-evidence claims for errors of law. *State v. Albright*, 925 N.W.2d 144, 150 (Iowa 2019).

**III. Discussion.**

*A. Jury Pool.* When faced with a Sixth-Amendment claim of unconstitutional underrepresentation of a racial group in a jury pool, Iowa follows the three-part test set forth in *Duren v. Missouri*, 439 U.S. 357, 364 (1979). *See Plain*, 898 N.W.2d

at 821–22. Under that test, a defendant can establish a prima facie violation of the

fair cross-section requirement by showing

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364. "If the defendant establishes a prima facie case, the

burden shifts to the state to justify the disproportionate representation by proving

'a significant state interest' is 'manifestly and primarily advanced' by the causes of

the disproportionate exclusion." *Plain*, 898 N.W.2d at 822 (citation omitted).

In *Plain*, which was decided a few months after Mong's trial, our supreme

court noted that to establish the second *Duren* prong "jurisdictions generally apply

one or more of the following statistical tests: (1) absolute disparity, (2) comparative

disparity, and/or (3) standard deviation." *Id.* Our supreme court had previously

determined the absolute disparity test was the appropriate test to use. *State v.*

*Jones*, 490 N.W.2d 787, 792–93 (Iowa 1992). "Absolute disparity is calculated 'by

taking the percentage of the distinct group in the population and subtracting from

it the percentage of that group represented in the jury panel.'"[3] *Plain*, 898 N.W.2d

at 822 (quoting *Jones*, 490 N.W.2d at 793). However, the *Plain* court faulted the

---

[3] "Comparative disparity is calculated by dividing the absolute disparity by the percentage of the population represented by the group in question." *Plain*, 898 N.W.2d at 823. "Standard deviation is calculated by analyzing a sample taken from the voter wheel and analyzing it for randomness and fluctuations." *Id.* The method "uses accepted statistical methods to determine the likelihood that a disparity between the minority percentage in the pool and in the population is the result of something *other than* chance." *State v. Lilly*, 930 N.W.2d 293, 300 (Iowa 2019).

absolute disparity test for failing to "account for the relative size of the minority group in the general population." *Id.* at 823.

> Exclusive use of the absolute disparity test creates problems of constitutional significance in Iowa. The test offers less protection for a minority group as the group's percentage of the community's total population decreases. In adopting the absolute disparity test in *Jones*, we noted that the Supreme Court had determined that "the underrepresentation of as much as ten percent" did not establish a prima facie case for the second *Duren* prong.

*Id.* at 825.[4] The court noted that because African Americans do not represent more than ten percent of the population of any county in Iowa, the test "leaves the right to an impartial jury for some minority populations without protection." *Id.* The court concluded "it is no longer appropriate to rely exclusively upon the absolute disparity test as an indicator of representativeness." *Id.* at 826.

In *Lilly*, the supreme court concluded standard-deviation analysis "get[s] at the heart of the matter . . . the probability that the disparity between a group's jury-eligible population and the group's percentage in the qualified jury pool is attributable to random chance." 930 N.W.2d at 302 (citation omitted). And then, in *State v. Veal*, the court concluded "a downward variance of two standard deviations must be shown under the Sixth Amendment." 930 N.W.2d 319, 329 (Iowa 2019).

> The *Plain* court stated:

> Defendants are entitled to access the information needed to enforce their constitutional right to a jury trial by a representative cross-section of the community. In this case, Plain attempted to obtain the information he is entitled to receive. Because our statutes do not specify a procedure for accessing the information, he took what we

---

[4] The *Plain* court found fault with the other two tests as well. *See* 898 N.W.2d at 822–23.

> view to be a reasonable approach—he asked the jury manager to provide it. The jury manager did not produce the information, citing a lack of access to the information the state is constitutionally required to maintain. To the extent Plain did not meet his prima facie case with respect to the third prong of the test, we conclude he lacked the opportunity to do so because he was not provided access to the records to which he was entitled.

898 N.W.2d at 828. The court "conditionally affirm[ed] Plain's conviction and remand[ed] to the district court for development of the record on the Sixth Amendment challenge." *Id.* at 829.[5]

Mong requests we remand to allow him an opportunity to develop the record on his challenge.[6] The State objects, contending Mong failed to present any evidence on the second and third prongs of the *Duren* test, and he is not entitled a "second crack at carrying his burden." Because Mong did not have the benefit of the *Plain/Lilly/Veal* line of cases, and because he is entitled to access the information needed to enforce his constitutional right to a jury trial and was not given access to that information, *id.* at 828, we will conditionally affirm and remand to give him an opportunity to develop his arguments. *See Lilly*, 930 N.W.2d at 308 ("Because the parties did not have the benefit of these refinements to the *Duren/Plain* standards, we have decided today to follow the same course of action as in *Plain*."); *Veal*, 930 N.W.2d at 330 ("As in *Plain* and *Lilly*, we believe the

---

[5] On remand, Plain failed to establish the third *Duren* prong, advancing only "run-of-the-mill jury management practices," which are within the state's broad discretion and will not sustain a cross-section challenge. *State v. Plain*, __N.W.2d ___, ___, 2022 WL 188431, at *4 (Iowa 2022).

[6] He also requests that we "take this case as an opportunity to continue to expand fair cross-section jurisprudence to apply not just to jury pools, but also to jury panels." Our supreme court has not been inclined to do so. *See State v. Wilson*, 941 N.W.2d 579, 593 (Iowa 2020) ("The *Plain*/*Duren* right applies to the jury pool.").

appropriate course of action here would be to remand the case. Neither the parties nor the district court had the benefit of today's decisions. A remand will offer Veal a further opportunity to develop his arguments that his Sixth Amendment right to an impartial jury was violated."); *accord State v. Armsted*, No. 19-1883, 2021 WL 1016575, at *6 (Iowa Ct. App. Mar. 17, 2021); *State v. Shaw*, No. 18-0421, 2019 WL 5790884, at *4 (Iowa Ct. App. Nov. 6, 2019); *State v. Voigts*, No. 18-1927, 2019 WL 5424965, at *2 (Iowa Ct. App. Oct. 23, 2019).

*B. Motion to Compel Testimony.* "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

Mong sought to compel Hughes to testify regarding Henlon's purported statement that he committed the crime, not Mong. Hughes was awaiting trial on a first-degree murder charge and made clear through counsel he would assert his Fifth Amendment right against self-incrimination. In *Heard*, our supreme court addressed whether a defendant could compel a witness to take the stand and assert his Fifth Amendment privilege in front of a jury. 934 N.W.2d at 439. The court ruled, "[W]hen a witness'[s] privilege against self-incrimination under the Fifth Amendment collides with an accused's right to compulsory process under the Sixth Amendment, the latter must give way." *Id.* at 440 (citation omitted). "The privilege against self-incrimination extends to answers that 'would furnish a link in the chain of evidence needed to prosecute the claimant for a . . . crime.'" *Id.* (citation omitted).

Mong attempts to distinguish his case from *Heard*. He notes the *Heard* court stated, "The trial court has the discretion to decide if the witness has grounds

to assert the privilege against self-incrimination and may require the witness to answer if it clearly appears to the court that he is mistaken." *Id.* (altered for readability) (citations omitted). Mong argues the court "made no inquiry as to whether Hughes had grounds to assert the privilege." But we know Hughes's counsel informed the court she had advised her client to invoke his right against self-incrimination "as it pertains to any substantive questions which, if the court read the deposition, started immediately after [the prosecutor] asked him what his name was and where he was currently residing." With respect to Mong's defense counsel's request that Hughes be required to invoke his right on a question-by-question basis, Hughes's counsel contended such a process "would lead Mr. Hughes saying things that potentially were favorable to the defense and rendering the State with the inability to cross-examine him, and that's where I have concerns as they pertain to Mr. Hughes'[s] trial as it comes in August." We discern no error in the court's not asking for further information as to whether Hughes had grounds to invoke the privilege. Nor can we find fault with the trial court's denial of Mong's motion to compel Hughes's testimony.

*C. Sufficiency of the Evidence.* We turn now to Mong's claim that there is insufficient evidence of his specific intent to harm or injure Shane Woods to support three of the convictions.

When reviewing sufficiency-of-the-evidence claims, "[w]e review all of the evidence presented at trial and consider it in the light most favorable to the State." *Albright*, 925 N.W.2d at 150. "When the evidence could convince a rational trier

of fact that the defendant is guilty beyond a reasonable doubt, the verdict is supported by substantial evidence." *Id.*

"Where, as here, the jury was instructed without objection, the jury instruction becomes law of the case for the purposes of reviewing the sufficiency of the evidence." *State v. Banes*, 910 N.W.2d 634, 639 (Iowa Ct. App. 2018). Thus, the question as presented here is whether there is substantial evidence of Mong's specific intent under the jury instructions given. The jury instruction related to attempted murder provided:

> In Count I, the State must prove all the following elements of Attempt to Commit Murder:
> (1) On or about June 1, 2018, the Defendant, Anthony Alexander Mong shot Shane Woods with a firearm.
> (2) By his acts, the defendant, Anthony Alexander Mong expected to set in motion a force or chain of events which could have caused or resulted in the death of Shane Woods.
> (3) When the defendant acted, *he specifically intended to cause the death of Shane Woods.*
> If the State has proved all of these elements, the defendant is guilty of attempt to commit murder.

(Emphasis added.) Similarly, the intimidation-with-a-dangerous-weapon instruction provided:

> In Count II, the State must prove all of the following elements of Intimidation with a Dangerous Weapon with Intent:
> (1) On or about June 1, 2018, the defendant, Anthony Alexander Mong, intentionally shot a dangerous weapon within an assembly of people;
> (2) Shane Woods actually experienced fear of serious injury and his fear was reasonable under the existing circumstances;
> (3) The defendant shot the dangerous weapon *with the specific intent to injure or cause fear or anger in Shane Woods.*
> If the State has proved all three of these elements, the defendant is guilty of intimidation with a dangerous weapon with intent.

(Emphasis added.) And regarding willful injury, the jury was instructed:

In Count III, the State must prove all of the following elements of willful injury causing bodily injury:

(1) On or about June 1, 2018, the defendant, Anthony Alexander Mong shot a firearm at Shane Woods.

(2) The defendant *specifically intended to cause a serious injury to Shane Woods.*

(3) Shane Woods sustained a bodily injury as a result of the defendant's actions.

If you find the State has proved all of the elements, the defendant is guilty of willful injury causing bodily injury.

(Emphasis added.) The specific-intent instruction provided:

"Specific Intent" means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind.

Because determining the defendant's specific intent requires you to decide what he was thinking when an act was done, it is seldom capable of direct proof. Therefore, you should consider the facts and circumstances surrounding the act to determine the defendant's specific intent. You may, but are not required to, conclude a person intends the natural results of his acts.

The State did not attempt to prove and does not assert there is *any* evidence Mong specifically intended to kill or injure Shane Woods. The State's theory of the case was that Mong intended to shoot *Ricco Martin.* In closing, the State explained transferred intent: "So if your intent is against A and you hit B, you get prosecuted for hitting B."

In its argument for a new trial, the defense stated "[B]ased on the instructions that were provided to the jury, the jury could not come back with the verdict they came back with."

The State relies upon the transferred-intent jury instruction:

Under the doctrine of transferred intent, once the intent to inflict harm on one victim is established, the criminal intent transfers to any other victim who is actually assaulted. A party is liable for a wrongful act, where there exists a criminal intent, although the act

done, is not that which was intended. The wrongful intent to do one act, is transposed to the other, and constitutes the same offense.

Had each of the italicized portions of the jury instructions set out above stated the intended target of the offenses was *Ricco Martin* or "Shane Woods *or another*," the jury might have found a transferred intent to Shane.[7] For example:

> In Count I, the State must prove all the following elements of Attempt to Commit Murder:
> (1) On or about June 1, 2018, the Defendant, Anthony Alexander Mong shot Shane Woods with a firearm.
> (2) By his acts, the defendant, Anthony Alexander Mong expected to set in motion a force or chain of events which could have caused or resulted in the death of Shane Woods.

---

[7] *See, e.g.*, *People v. Hill*, 658 N.E.2d 1294, 1297–98 (Ill. App. Ct. 1995). In *Hill*, the jury was instructed:

> To sustain the charge of attempt first degree murder of Jose Tanon, the State must prove the following propositions:
> (1) That defendant performed an act which constituted a substantial step toward the killing of Jose Tanon; and
> (2) That defendant did so with the intent to kill Jose Tanon.
> To sustain the charge of attempt first degree murder of Elizabeth Perez, the State must prove the following propositions:
> (1) That the defendant performed an act which constituted a substantial step toward the killing of Elizabeth Perez; and
> (2) That defendant did so with the intent to kill Elizabeth *or another*."
> . . . .
> Although defendants contend they lacked a specific intent to kill Elizabeth, it is difficult to ignore the notions that (1) defendants threatened *both* Jose and "his family," and (2) spraying a house with gunfire constitutes a substantial step toward the commission of murder. Further, the defendants appear to ignore the theory of transferred intent explicitly applied to the count for Elizabeth.
> The law is well settled that where a person shoots at one with intent to kill and murder, but kills one whom he did not intend to injure, he is not absolved from answering for the crime of murder. Moreover, the doctrine of transferred intent is applicable in attempt murder cases. Accordingly, if the evidence established that defendants had a specific intent to kill Jose, which the jury found, then that intent is transferred to Elizabeth under the doctrine of transferred intent, and defendants' convictions were proper.

(Internal citations omitted.)

(3) When the defendant acted, he specifically intended to cause the death of *Shane Woods or another.*
If the State has proved all of these elements, the defendant is guilty of attempt to commit murder.

But there is no evidence to support the three convictions here because there is no evidence to support the element Mong had a specific intent to cause the death of, intimidate, or cause bodily injury to Shane Woods. We therefore reverse the convictions for attempted murder, intimidation with a dangerous weapon, and willful injury. We affirm the conviction for going armed with intent.

**IV. Conclusion.**

Because Mong did not have the benefit of the *Plain/Lilly/Veal* line of cases, and because he is entitled to access the information needed to enforce his constitutional right to a jury trial and was not given access to that information, we will remand to give him an opportunity to develop his arguments. We affirm the district court's denial of Mong's motion to compel. Finally, there is no evidence of a specific intent to harm or kill Shane Woods and, thus, there is insufficient evidence to support the charges of attempted murder, intimidation with a dangerous weapon, and willful injury causing bodily injury. We reverse those convictions. We conditionally affirm the conviction for going armed with intent and remand the matter to the district court for development of the record on the challenge to the composition of the jury. Following development of the record, we direct the district court to determine whether Mong's constitutional right to a representative jury was violated. If so, the court shall grant a new trial.

**REVERSED IN PART, AFFIRMED ON CONDITION IN PART, AND REMANDED.**